GONZALES, Judge.
By this appeal, the State of Louisiana through the Board of Ethics for Elected Officials as the Supervisory Committee on Campaign Finance Disclosure (the Supervisory Committee) seeks reversal of the dismissal of its suit alleging various campaign violations associated with the 1991 gubernatorial campaign of one of the candidates.
David Duke was a candidate for governor in the 1991 election. He established the “David Duke for Governor” committee which functioned as his principal campaign committee. James McPherson was the chairman of the committee and Paul Allen was its treasurer.
After conducting an investigation of the campaign pursuant to La.R.S. 18:1511.4, the Supervisory Committee brought suit against the candidate, the David Duke for Governor committee, James McPherson,[2] and Paul Allen, alleging violations of the Campaign Finance Disclosure Act, La.R.S. 18:1481 et seq.
After hearing the matter, the trial court rendered judgment dismissing the Supervisory Committee’s petition as to the candidate, the David Duke for Governor committee, and Paul Allen. The Supervisory Committee appeals that judgment, asserting the following assignments of error:
1. The trial court erred in concluding that substantial amounts of cash collected by Duke when buckets were passed at rallies constituted receipts from legitimate sales of campaign paraphernalia.
2. The trial court erred in concluding that the event staged by the Duke campaign known as the “Dukefest” was not a fund-raising event.
3. The trial court erred in concluding that no receipt was required under the provisions of La.R.S. 18:1505.2(0(2) for cash contributions received via the Ismail.
4. The trial court erred in determining that money orders containing illegible names were not anonymous contributions required to escheat to the State, pursuant to La.R.S. 18:1505.2(B)(1).
5. The trial court erred by failing to find that Duke inaccurately reported contributions when the evidence clearly showed that the campaign had information available that was not reported.
6. The trial court erred by finding that Duke used campaign funds to promote a *1281 private publication but in failing to find that the use violated La.R.S. 18:1505.2(1).
7. The trial court erred by applying the “knowing and willful” standard used to determine whether penalties should be imposed to decisions of whether violations of the CFDA occurred.
8. The trial court erred by allowing a party defendant to testify to ultimate conclusions of law.
Before addressing the Supervisory Committee’s assignments of error, a discussion of the origin and purpose of the Campaign Finance Disclosure Act is in order.
BACKGROUND OF THE CAMPAIGN FINANCE DISCLOSURE ACT
By Act 718 of 1975, the Louisiana legislature enacted the Election Campaign Finance Disclosure Act. La.R.S. 18:1481-18:1493. In general, the Act required the reporting of information regarding contributions and expenditures involved in campaigns for elective state and local public office, decried certain activities as illegal campaign practices, condemned violation of the Act to be a misdemeanor, and established the machinery and procedure for administration and enforcement of the provisions of the Act. Guidry v. Roberts, 335 So.2d 438, 441 (La.1976). The Act was amended and reenacted in 1980 by La.Acts 1980, No. 786, § 1, effective January 1, 1981, and re-titled as the Campaign Finance Disclosure Act (the CFDA). La.R.S. 18:1481. In amending and reenacting the CFDA, the legislature included La.R.S. 18:1482, which sets forth the following statement of purpose:
LThe legislature recognizes that the effectiveness of representative government is dependent upon a knowledgeable electorate and the confidence of the electorate in their elected public officials. The legislature, therefore, enacts this Chapter to provide public disclosure of the financing of election campaigns and to regulate certain campaign practices.
Constitutionality of the CFDA
The First Amendment of the United States Constitution protects political association as well as political expression. Discussion of public issues and debate regarding the qualifications of candidates are essential to the operation of the system of government established by the Constitution. The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Buckley v. Valeo, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). Thus, any legislation which restricts the rights of the people to politically associate with candidates of their choice and to express their political views operates in an area of the most fundamental First Amendment activities. However, in a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. Therefore, the government has a keen interest in preserving the integrity of the electoral process and may adopt reasonable restrictions which further this interest although these restrictions may limit the rights of political association and political expression. Buckley v. Valeo, 424 U.S. at 14, 18, 96 S.Ct. at 632, 634.
In Guidry, a suit brought by a contributor to political campaigns, the Louisiana Supreme Court was faced with deciding the constitutionality of the predecessor statute of the CFDA. In finding that the contribution and disclosure provisions of the earlier statute did not violate the basic freedoms encompassed in the Louisiana Constitution, |r,the Guidry court relied upon the reasoning in Buckley, in which the United States Supreme Court rejected similar constitutional attacks on the Federal Election Campaign Act. Regarding the disclosure requirements, the Guidry court relied on Buckley which stated:
The governmental interests sought to be vindicated by the disclosure requirements are of ... [important] magnitude. They fall into three categories. First, disclosure provides the electorate with information “as to where political campaign money *1282 comes from and how it is spent by the candidate” [footnote omitted] in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate’s financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.
Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. [footnote omitted] This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate’s most generous supporters is better able to detect any post-election special favors that may be given in return, [footnote omitted] And, as we recognized in Burroughs v. United States, 290 U.S. [534], at 548, 54 S.Ct. [287], at 291 [78 L.Ed. 484 (1941) ], Congress could reasonably conclude that full disclosure during an election campaign tends “to prevent the corrupt use of money to affect elections.” ...
Third, and not least significant, record-keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limits [of the Act.]
424 U.S. at 66-67, 96 S.Ct. at 657-658.
With the above principles in mind, we address the Supervisory Committee’s assignments of error.
PASSING THE BUCKET
In assignment of error number one, the Supervisory Committee argues that the trial court erred in concluding that substantial amounts of cash collected by the candidate’s campaign by passing buckets at campaign rallies constituted receipts from legitimate sales of campaign paraphernalia.
| ^Generally, the CFDA mandates that a contributor of cash of one hundred dollars or less be given a written receipt by the political candidate or committee receiving the contribution, and that records be kept by the candidate or committee regarding the contributor and the contribution. La.R.S. 18:1505.2(0(2). However, the CFDA contains a limited exception to this general rule which allows candidates and their committees in the case of any single transaction to sell campaign paraphernalia for twenty-five dollars or less without incurring obligations of record-keeping as to an individual purchaser; instead, it is the total amount received from such sales and the fact that such amount was received from such sales that must be recorded. La.R.S. 18:1491.5(B)(2).
According to the trial court, the candidate’s campaign took this exception and “concocted an idea that what they would do is pass a bucket so people could make contributions and also they would pass the bucket for them to take some political paraphernalia.” Paul Allen, the campaign committee treasurer, and the person who originated the “passing the bucket” scheme described the suggested procedure as “pass[ing] two hats, one to put the money in, one to take out a campaign button, doubloon, picture, et cet-era.” According to the candidate, who testified at the hearing, he always instructed potential contributors to contribute no more than twenty-five dollars, and to take paraphernalia from the second bucket being passed in return for their cash contribution placed in the first bucket. The candidate also stated that a person carrying a second bucket containing paraphernalia carefully monitored the procedure.
Nevertheless, several witnesses, including three former campaign workers, a person observing the candidate’s campaign and a television reporter, gave testimony indicating that, at various campaign rallies, there was no effort to monitor cash being deposited into the bucket, that paraphernalia was not provided to contributors inpexchange for contributions, and that the candidate gave no instructions about receiving paraphernalia for cash contributions.
*1283 In its reasons for judgment, the trial court notes the conflicting testimony regarding how the “pass the bucket” scheme was operated by the candidate’s campaign. Although the court concludes that there was an “attempt by [the candidate] to inform the people that if they put money in the bucket, that they couldn’t put more than $25.00 and he wanted them to take something, some paraphernalia,” the trial court also notes that it is “not so naive to think that there would be a piece of campaign paraphernalia given to every person who put anywhere from one penny to $25.00 in the buckets,” and that the court was “sure there were instances, perhaps, that people didn’t take paraphernalia even though instructed to do so.”
It is true that the trial court’s factual determination that paraphernalia was exchanged for cash in most instances of passing the bucket cannot be challenged on appeal absent manifest error. However, even if we were to assume that paraphernalia was exchanged for cash in every instance of passing the bucket, this scheme does not comply with the “single transaction under twenty-five dollars” exception set forth in subsection 1491.5(B)(2) of the CFDA. This exception was designed to accommodate the legitimate one-on-one sale of campaign paraphernalia for a nominal sum. The exception specifically provides for “a single transaction involving the sale of items ...” (Emphasis added.) The use of the word “single” needs no elaboration. By choosing the word “sale,” the legislature used a concept well known in Louisiana law. Louisiana Civil Code article 2439 defines a sale as a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale. Interpreting the CFDA in pari materia with the Civil Code, we find that the Civil Code requirements of a sale apply within the confines of the CFDA, with the only limitation being that the | gCFDA requires that the sale be limited to a maximum price of twenty-five dollars. In the “pass the bucket” scheme used in this case, it is clear from the evidence that there was no agreement as to the “thing” being purchased — any item in the bucket could be chosen; further, there was actually no agreement as to a specific price. The scheme clearly involved “donations” by persons attending the campaign rallies, which are regulated by the CFDA, and not “sales” of paraphernalia under twenty-five dollars, which are exceptions to the CFDA.
The use of a scheme such as the passing of the bucket has the potential of seriously undermining the effectiveness of the exception. With such a scheme, the one-on-one characteristic of the transaction is lost; it is virtually impossible for even the most astute campaign worker to insure that each contributor is placing no more than twenty-five dollars in the bucket and that each contributor is also completing the so-called “sale” of paraphernalia by taking something from the second bucket. This inability to monitor the transaction produces the possible dangers against which the CFDA was designed to guard.
Although the CFDA does not specifically mandate that a particular method of sale be used to achieve the single transaction under twenty-five dollars allowed by the exception in subsection 1491.5(B)(2), it is clear that the purposes of the CFDA are fulfilled by construing the exception narrowly and allowing only legitimate one-on-one transactions in which items are actually sold for set amounts of cash.
Thus, the “pass the bucket” scheme used by the candidate’s campaign does not fall within the exception contained in La.R.S. 18:1491.5(B)(2), and therefore, constitutes a violation of La.R.S. 18:1505.2(0(2) which requires that a contributor of cash of one hundred dollars or less be given a receipt by the campaign committee receiving the contribution, and that records be kept by the committee regarding the identity of the contributor and the contribution.
19Once a determination is made that a violation of the CFDA has occurred, the next issue which must be addressed is whether the violation warrants the imposition of a *1284 penalty. Under subsection 1505.5(A) of the CFDA, any person who knowingly and willfully violates any provision of section 1505.2 shall be assessed a civil penalty for each violation. For purposes of subsection 1505.5(A), “knowingly and willfully” means conduct which could have been avoided through the exercise of due diligence.
The trial court found that “mistakes” were made by the Duke campaign; nevertheless, the court refused to impose penalties based on its finding that none of the conduct was done knowingly and willfully. However, the trial court appears to have used the concept of willfulness as referring to an intentional act committed when the actor actively desires the intended result to follow, a standard usually found in criminal statutes.[3] If he did so, it was legal error, because the CFDA, by its very terms, defines willfulness as “conduct which could have been avoided through the exercise of due diligence.”
The word “willful” generally means, as it is defined by Black’s Law Dictionary 1773 (4th ed. 1968), an act done intentionally, knowingly, and purposely, without justifiable excuse, as distinguished from an act done carelessly. A willful act differs from an act that merely lacks due diligence. If we were dealing with the traditional notion of a willful act, the result would be different from that suggested by the CFDA.
We have been unable to find any Louisiana jurisprudence which defines due diligence within the context of the CFDA. Generally, “due diligence” requires that measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances. It is not measured by any absolute standard, but depends upon the Lorelative facts of the particular ease. Black’s Law Dictionary 411 (5th ed. 1979).
Under the facts of this case, due diligence required that all responsible parties— the candidate, the campaign chairman, and the campaign treasurer- — make a diligent inquiry into the propriety of their campaign activities under the CFDA. A diligent inquiry is such inquiry as a prudent man, intent upon ascertaining a fact, would ordinarily make. It is inquiry made with diligence and good faith to ascertain the truth. Liepelt v. Baird, 17 Ill.2d 428, 161 N.E.2d 854, 857 (1959).
Based on the record before us, we find that the trial court erred in finding that the Duke campaign’s use of the “pass the bucket” scheme was not a knowing and willful violation of the subsection 1505.2(C)(2) receipt requirement.
Paul Allen testified that he had several discussions with Maris McCrory, a Supervisory Committee staff member, regarding the requirements of the CFDA. Although Allen and McCrory discussed the requirements of the paraphernalia sale exception, Allen clearly testified that he devised the “pass the bucket” scheme, but never actually discussed the scheme with McCrory or obtained her approval for its use. Specifically, Allen’s testimony is as follows:
Q: The entirety of the conversation ... that you had with [McCrory] on March 18th concerning paraphernalia sales was in fact recorded; isn’t that true?
A: Yes. Yes.
Q: And I believe it was also transcribed in addition to being recorded?
A: Yes.
Q: And in reading that transcription, I do not see any reference to any passing of the hat or passing of two hats, so obviously, that did not occur during the course of that conversation?
A: Oh, she never said that; right. No, I never said she did.
A fair reading of this testimony indicates that Allen did not receive approval from *1285 McCrory for the use of the “pass the bucket” scheme as a valid means of meeting Inthe requirements of a paraphernalia sale under subsection 1505.2(C)(2). Had McCrory approved the “pass the bucket” scheme as being in compliance with the paraphernalia sale exception, regardless of whether McCrary's interpretation would have been correct or incorrect, we would agree that the violation was not knowing and willful. However, Allen never sought to have the scheme approved, relying instead on his own ideas as to what practices would satisfy the paraphernalia sale exception. Under the facts before us, we find that due diligence was not exercised by Allen. The violative use of the “pass the bucket” scheme could have been avoided had Allen made a diligent inquiry about the legality of his proposed scheme with a staff member of the Supervisory Committee before its implementation.
Therefore, we reverse the finding of the trial court on this issue and conclude that the “pass the bucket” scheme violation was, indeed, knowing and willful as defined by the CFDA. Under La.R.S. 18:1505.5(B)(1), the amount of the civil penalty for each violation shall be “[n]ot in excess of five hundred dollars for each candidate for a major office and any treasurer or chairman of any committee or person supporting or opposing such a eandidate[.]” Allen was the treasurer of the David Duke for Governor committee and the person who implemented the “pass the bucket” scheme. Therefore, we find it proper to assess a civil penalty against him in the amount of two hundred fifty dollars for the use of the “pass the bucket” scheme.[4]
DUKEFEST
In assignment of error number two, the Supervisory Committee argues that the trial court erred in concluding that the “Du-kefest” event staged by the candidate’s campaign was not a fundraising event.
| i2The CFDA requires that all transactions involving the sale of tickets to a testimonial or similar fundraising event be evidenced by a record of the names and addresses of the purchasers, the number of tickets purchased, and the value of the tickets purchased. La. R.S. 18:1491.5 (B)(4).
In 1991, the candidate’s campaign began to sell tickets for twelve dollars through Ticketmaster outlets for an event known as the “Dukefest” which was to be held at City Park in New Orleans on July 4, 1991. However, no records were kept as to names and addresses of the purchasers. By letter dated July 2, 1991, the Supervisory Committee expressed concern over the manner in which the Dukefest tickets were being sold, and pointed out the subsection 1491.5(B)(4) requirement that records be kept.[5]
The candidate’s campaign thereafter structured the Dukefest in such a manner so that tickets purchased (both those purchased in advance from Ticketmaster as well as those purchased for fifteen dollars at the gate) could be redeemed for paraphernalia and free admission to the Dukefest. According to Paul Allen, signs at the gate directed ticket purchasers to redeem the tickets for campaign souvenirs, paraphernalia, and free admission to the Dukefest by going through a maze of tables containing items before entering the grounds. However, admission did not require a ticket and any person wishing to attend the Dukefest could do so without the purchase of a ticket.
The trial court concluded that the Duke-fest “wasn’t a fundraising event because [as] I appreciate [it], it was just for the purpose *1286 of the people to come.” The trial court made the factual determination that the Dukefest was not a fundraiser, and hence, no violation occurred. This finding cannot be reversed on appeal absent manifest error. However, the trial court’s conclusion directly contradicts the evidence contained in the record, including the testimony of the candidate himself. When asked at the hearing |18what purpose was served by the ticket, the candidate responded, “Well, we are trying to raise money, aren’t we[?]; that’s the purpose the ticket served.”
Although we acknowledge that deference to the trial court’s factual determinations should be accorded, we nonetheless have a constitutional duty to review facts. La. Const, art. Y, § 10(B); Spiegal v. Fireman’s Fund Insurance Company, 94-1252 (La. 2/20/95), 650 So.2d 742; Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216, 221. This court has the authority to determine whether the trial court’s conclusion was clearly wrong based on the evidence, or clearly without evidentiary support.
Either the Dukefest was a free event or it was a fundraiser. The crucial inquiry for purposes of the CFDA asks how the event was promoted by the candidate’s campaign. There are many campaign appearances held by political candidates where the public gathers merely for the purpose of hearing the candidate speak. Gatherings such as these are free and typically occur on courthouse steps or in open-air locations. In contrast, other campaign functions are structured, organized events put on by political candidates at hotels, restaurants, banquet facilities, or fraternal and social clubs, halls, or lodges. Attendance at this latter type of event is usually advertised in advance and requires that a fee be paid; in other words, this type of event is held out and promoted by the candidate and his campaign as a fundraising event. In the political arena, there is a clear distinction between free and fundraising events.
The record in this case indicates that the Dukefest was structured and promoted as a fundraising event by the candidate’s campaign. Both advance tickets and event-day tickets were sold, and the event was organized and held out by the candidate’s campaign as including live entertainment, complimentary food and drinks, and games and activities for children. Based on the record as a whole, it is clear that the trial court manifestly erred in determining that the Dukefest was not a fundraising event.
_JuThe trial court also noted in its reasons for judgment that the tickets themselves might have constituted “paraphernalia,” which would have allowed for their purchase at twelve dollars or fifteen dollars to fall within the “single transaction under twenty-five dollars” exception to the general CFDA disclosure rule. However, the CFDA clearly distinguishes between the sale of paraphernalia (addressed in subsection 1491.5(B)(2)) and the sale of tickets to fundraising events (addressed in subsection 1491.5(B)(4)).
Although “ticket” is not defined for purposes of the CFDA, the relevant definition given in Merriam-Webster’s Collegiate Dictionary 1232 (10th ed. 1994) states that a “ticket” is “a certificate or token showing that a fare or admission fee has been paid.” As counsel for appellee conceded at oral argument that a dictionary is a good source from which to gain meaning for statutory terms not specifically defined in a statute, we rely on the dictionary definition of “ticket” as a clear indication that a “ticket” is an item which represents that money has been paid by its holder.
In the instant case, it is obvious that the money received from the sale of tickets to the Dukefest was intended to raise funds for the candidate’s campaign and that the tickets were not intended merely as paraphernalia. Apparently, it was only after concerns were expressed by the staff of the Supervisory Committee as to the recordkeeping and reporting implications that there was an attempt to convert the tickets into paraphernalia or into valueless items redeemable for paraphernalia and free admission to the Dukefest. These efforts by the candidate’s *1287 campaign were merely taken to avoid the record-keeping and reporting requirements of the CFDA with regard to fundraising events. Thus, as earlier stated, the trial court manifestly erred in finding that the Dukefest was not a fundraising event. Consequently, the sale of tickets to the Dukefest without the recordation and reporting of the names and addresses of the purchasers, the number of tickets purchased, and the value of the tickets purchased, constitutes a violation of subsection 1491.5(B)(4).
|lsAs previously stated, once a determination is made that a violation of the CFDA has occurred, the next issue to be addressed is whether the violation warrants the imposition of a civil penalty. Under subsection 1505.5(A), any person who knowingly and willfully violates any provision of the CFDA shall be assessed a civil penalty for each violation.
Regarding the Dukefest, the trial court found that no violation occurred, and thus, never reached the issue of whether the sale of tickets to the Dukefest without meeting the recordation and reporting requirements of the CFDA was knowing and willful. Because we find that a violation did occur, we now address whether the violation involving the Dukefest could have been avoided through the exercise of due diligence.
The testimony in the record supports a finding that the candidate relied upon his staff, particularly Paul Allen, to make sure that the Dukefest would be structured in such a manner as to comply with the CFDA. There is no contrary evidence indicating a lack of diligent inquiry on behalf of the candidate. With regard to Allen, the record is silent regarding whether or not he made inquiries to the Supervisory Committee staff regarding the legality of the Dukefest. It was the Supervisory Committee’s burden to show a lack of due diligence. Because the record is void of any such evidence, we find that there can be no finding of a knowing and willful violation of the CFDA with regard to the Dukefest, and hence, no penalties are warranted.
CASH CONTRIBUTIONS BY MAIL
In assignment of error number three, the Supervisory Committee argues that the trial court erred in concluding that no receipt was required under the provisions of La.R.S. 18:1505.2(0(2) for cash contributions received by mail.
Paul Allen testified that cash contributions were indeed received through the mail, but that no receipts were given because he believed that none were required under |ifithe circumstances. The trial court found that the subsection 1505.2(C)(2) requirement that mandates the giving of a receipt for cash contributions not in excess of one hundred dollars did not apply to cash received through the mail.
We find that the trial court’s interpretation of subsection 1505.2(C)(2) constitutes legal error. There is no authority to disregard the receipt requirement for cash received through the mail. The receipt requirement of the statute is very clear, specific, and detailed. It was, no doubt, drafted in such a manner as to discourage the use of cash, which provides problematical opportunities to avoid record-keeping and reporting requirements. The detailed receipt requirement of subsection 1505.2(C)(2) interjects a method of control over the use of cash contributions. Further, the receipt requirement in no way states or even implies that it is only applicable when cash is contributed in a face-to-face encounter. Thus, we find that the failure of the campaign to provide receipts for cash contributions received through the mail constitutes a violation of subsection 1505.2(C)(2).
We further find that the campaign’s interpretation of the receipt requirement as pertaining only to face-to-face transactions does not constitute the due diligence necessary to avoid the imposition of a penalty. In particular, Allen’s testimony establishes that he merely assumed that the receipt requirement of subsection 1505.2(C)(2) did not apply to cash contributions received through the mail. He admits that he did not contact the Supervisory Committee, nor did he even consult with P.K. Wallace, the attorney who had *1288 specifically been hired by the campaign to render advice on campaign matters. Under these circumstances, a mere assumption as to what the law requires does not satisfy the due diligence required under the CFDA. Thus, we find that a penalty in the amount of two hundred fifty dollars against Paul Allen is appropriate.
JivILLEGIBLE NAMES
In assignment of error number four, the Supervisory Committee argues that the trial court erred in determining that money orders containing illegible names were not anonymous contributions required to escheat to the State, pursuant to La.R.S. 18:1505.2(B)(1). That legislation provides as follows:
No candidate, political committee, or other person required to file reports under this Chapter shall make any expenditure from funds the source of which is anonymous, and any contribution received by a candidate, political committee, or other person required to file reports under this Chapter from an anonymous source and deposited shall be reported as provided in R.S. 18:1491.7(B)(24) and R.S. 18:1495.5(B)(23) and shall escheat to the state and shall be paid over to the state by such candidate, political committee, or other such person.
In making this argument, the Supervisory Committee is asking this court to extend the definition of the term “anonymous”, which means without a name, to include names which are not legible and which are questionable. Louisiana Civil Code article 9 provides that when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. By the clear and unambiguous terms of the statute, only those contributions made by anonymous contributors escheat to the State. This argument has no merit.
INACCURATE REPORTING OF CAMPAIGN CONTRIBUTIONS
In assignment of error number five, the Supervisory Committee argues that the trial court erred by failing to find that the candidate and the campaign inaccurately reported contributions when the evidence clearly showed that the campaign had information available that was not reported. Louisiana Revised Statute 18:1505.1(C) states that “[fjailure to disclose or failure to disclose accurately any information required to be reported by this Chapter shall constitute a violation of this Chapter.” The Supervisory Committee submitted evidence of nine violations of this statute, stating that the Duke campaign could have accurately reported these contributions merely by | ^reviewing its own records. The record reflects large amounts of small contributions received through the mail daily, yet there were only nine violations of this statute from thousands of contributions throughout the campaign. The amount of the contributions involved in these nine violations was less than two thousand dollars; the total contributions collected by the campaign were approximately two million dollars. We find no manifest error in the trial court’s determination that these nine violations were not knowing and willful. Therefore, the trial court correctly declined to assess penalties for these violations.
DUKE REPORT
In assignment of error number six, the Supervisory Committee argues that the trial court erred in finding that the candidate used campaign funds to promote a private publication, the Duke Report, but in fading to find that the use violated La.R.S. 18:1505.2(1), and in failing to assess penalties for the violations.
In general, La.R.S. 18:1505.2(I)(1) prohibits the use, loaning, or pledging of campaign contributions for expenses unrelated to a candidate’s political campaign. Subsection 1505.2(I)(1) reads, in pertinent part:
On and after January 1, 1991, contributions received by a candidate or a political committee may be expended for any lawful purpose, but such funds shall not be used, loaned, or pledged by any person for any personal use unrelated to a political cam *1289 paign or the holding of a public office or party position[.]
The trial court did indeed find that violations occurred when campaign funds were used to promote the Duke Report. However, the trial court did not assess a penalty for the violation. Louisiana Revised Statute 18:1505.2(J)(1) provides that any candidate, treasurer, or chairman of a political committee who violates any provision of subsection H or I (which prohibit the use of campaign funds for expenses unrelated to a campaign) shall be assessed a penalty. If the violation is “knowing and willful,” the maximum amount of the penalty increases; that is, a knowing and willful violation of 119the statute requires an enhancement of the penalty.
As pointed out in the Supervisory Committee’s brief, it seems that the trial court combined its analysis of whether violations occurred and whether the violations were knowing and willful, and based on its conclusion that none of the violations were knowing and willful, it refused to assess penalties. However, the determination of whether a violation occurred is separate from a determination of whether a penalty should be imposed. Subsection 1505.2(J)(1) mandates that a penalty be imposed when a violation of 1505.2(H) or (I) occurs, regardless of whether the violation was knowing and willful. Thus, after finding that an improper use of campaign funds did occur, the trial court erred in failing to assess a penalty for the violation use.
Under La.R.S. 18:1505.2(J)(1),
[a]ny candidate, treasurer, or chairman of a political committee who violates any provision of Subsection H or I of this Section shall be assessed a penalty of not more than five thousand dollars or the amount of the violation, whichever is greater, except that the penalty for a knowing and willful violation shall not be more than ten thousand dollars or two hundred percent of the violation, whichever is greater. “Knowing and willful”, for purposes of this Subsection, means conduct which could have been avoided through the exercise of due diligence. The civil penalties provided for in R.S. 18:1505.5 shall be inapplicable to violations of Subsection H or I....
As subsection 1505.2(J)(1) clearly indicates, a penalty is automatic when it is established that a violation has occurred, regardless of whether the violation is knowing and willful. Because the record contains sufficient evidence to demonstrate that both Duke and Allen allowed campaign funds to be used for the promotion of the Duke Report, a publication unrelated to the candidate’s campaign, and because the term “use” is a broad term which encompasses the concept “allowed to be used,” a penalty must be assessed against both of them in this situation. However, we are unable to conclude that the violation regarding the Duke Report was knowing and willful, warranting the imposition of an enhanced penalty. Testimony in the record indicates that members ofRpthe campaign did inquire regarding the legality of advertising the Duke Report during the television program promoting the candidate’s gubernatorial campaign. Thus, no enhancement of the penalty is warranted.
In this instance, the trial court’s reasons for judgment indicate that the amount of the violation was one thousand, one hundred eleven dollars, thirty-four cents. We find that a penalty of one thousand, one hundred eleven dollars, thirty-four cents against Duke, as the candidate, and a penalty of one thousand, one hundred eleven dollars, thirty-four cents against Paul Allen, as the campaign treasurer, is appropriate.
IMPROPER TESTIMONY
In assignment of error number eight, the Supervisory Committee argues that the trial court erred by allowing a party defendant to testify to ultimate conclusions of law. In making this assertion, the Supervisory Committee refers to the following part of the candidate’s testimony:
MR. DEATON: In other words, did you knowingly and willfully comply with as far as you understood, all the re *1290 quirements of the Campaign Finance Disclosure Act?
MR. SEXTON: Objection, Your Honor. That calls for a conclusion and the ultimate conclusion that the court would have to draw from the testimony.
THE COURT: Correct. Sustain the objection.
THE COURT: Why don’t you ask him whether or not he willfully violated any laws, whether or not he knowingly violated any of the laws?
MR. DEATON: Mr. Duke, did you knowingly, willfully violate the Campaign Finance Disclosure Act?
The ultimate issue in this case is whether the three parties, who could be liable under the Act, violated the Act; and, if we find that they violated the Act, we must further determine the amount of any fine which they should be assessed. As noted above, the question of willfulness is an element of the violations or of penalty [ 2ienhancement. It is only part of what must be proven in order to make out a case for violation. It was certainly proper for either side to ask any of the parties charged with a violation whether or not their conduct was willful. Willfulness is discussed at length above. The purpose of the question does not address an ultimate issue of fact.
When a party objects to an item of evidence, he should be able to cite some section of the Louisiana Code of Evidence or some jurisprudence that excludes the evidence. On the question of ultimate issue, the Code of Evidence provides, in article 704, as follows:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of an accused.
Although the particular witness in this ease was not testifying in the capacity of an expert witness, La.C.E. art. 704 generally applies to lay witnesses as well as expert witnesses. Pugh, Force, Rault & Triche, Louisiana Handbook on Evidence Law, authors’ notes (2) and (4) at page 397 (1993). The only exclusion is in a criminal case or where the trial court believes the testimony of expert or layman, on the real ultimate issue of fact, would not be helpful. For instance, the question addressed to the candidate, i.e., whether he thinks he should be fined for violating the law, would not be helpful. However, there is absolutely nothing wrong with asking a person charged with transgressing a statute (which imposes civil penalties) whether his conduct was willful intentional. The objection in this case apparently stems from an antiquated common law rule that has been rejected for more than twenty years.[6] Article 704 of the Louisiana Code of Evidence tracks article 704 of the Federal Rules of Evidence and the ^objection used here is simply not valid under our code. Accordingly, we find that this particular assignment of error lacks merit.
CONCLUSION
The fundamental purpose of the CFDA is to allow citizens to make better-informed political decisions by having access to information regarding a candidate’s financial contributors. The primary interest served by the limitations contained in the CFDA, and indeed, by the CFDA as a whole, is the prevention of actual or perceived corruption spawned by the real or imagined coercive influence of large financial contributions on candidates’ positions and on their subsequent actions if elected to office. A contrary deci *1291 sion regarding the Duke campaign’s “pass the bucket” scheme, the characterization of the Dukefest, the receipt and reporting requirements for cash contributions received through the mail, and the Duke Report violation would create dangerous precedent for future interpretation of the CFDA. It would invite those who seek anonymity in order to influence elections, and candidates who prefer not to disclose the source of their funding, to fashion creative means by which to subvert the intended goals of the CFDA. Were these erroneous interpretations of the statute allowed to stand, large loopholes would result in the CFDA, rendering it totally ineffective. Although we may not agree with the law, it is not the function of the judiciary to repeal it by imaginative interpretation. The legislature remains the fundamental lawmaker and any major modification of laws must come from that body, not the judiciary.
DECREE
For the foregoing reasons, the judgment of the trial court is REVERSED IN PART, AMENDED IN PART, and AFFIRMED IN PART.
The judgment is REVERSED insofar as it failed to find that the “pass the bucket” scheme was a violation of the CFDA subsection 1505.2(C)(2). The judgment |23is also REVERSED insofar as it failed to assess a penalty for a knowing and willful violation of the CFDA in this instance. A penalty of two hundred fifty dollars is assessed against Paul Allen.
The judgment is REVERSED insofar as it failed to characterize the Dukefest as a fund-raising event for which the Duke campaign was responsible for certain record-keeping and reporting requirements under CFDA subsection 1491.5(B)(4). We hold that the Dukefest was a fundraiser and that the Duke campaign violated subsection 1491.5(B)(4) in failing to comply with its record-keeping and reporting requirements. However, we decline to assess a penalty for the violation because it does not meet the knowing and willful requirement of subsection 1505.5(A).
The judgment is REVERSED insofar as it failed to apply the receipt and reporting requirements of subsection 1505.2(C)(2) for cash contributions received through the mail. We find that a violation occurred when the Duke campaign accepted cash contributions through the mail without compliance with subsection 1505.2(C)(2). We further find that the violation was committed knowingly and willfully by Paul Allen and assess a penalty against him in the amount of two hundred fifty dollars.
The judgment is AFFIRMED insofar as it finds that there was an improper use of campaign funds associated with the promotion of the Duke Report, in violation of La.R.S. 18:1505.2(J)(1). However, because the trial court found that there was a violation of the CFDA associated with the promotion of the Duke Report, a penalty was required by subsection 1505.2(J)(1). We AMEND the judgment to assess a penalty in the amount of one thousand, one hundred eleven dollars, thirty-four cents against David Duke and a penalty of one thousand, one hundred eleven dollars, thirty-four cents against Paul Allen.
In all other respects, the judgment of the trial court is AFFIRMED. Costs of this appeal are assessed to the appellees.
FOGG, J., dissents in part and concurs in part and assigns reasons.
TANNER, J. Pro Tem., dissents in part and concurs in part for the reasons assigned by FOGG, J.

. James McPherson did not participate in the trial as a party due to a stay rendered by the United States Bankruptcy Court for the Eastern District of Louisiana.

. See, for example, La.R.S. 47:1641 regarding the criminal penalty for failing to account for state tax moneys and 2 U.S.C.A. § 437g(d)(l)(A) regarding the criminal penalty for violations of the Federal Elections Campaign Act.

. Although the statute indicates that a penalty shall be imposed for each violation of the statute, the record does not indicate the number of times that the “pass the bucket" scheme was used by the Duke campaign. Although it is clear that the scheme was used at multiple Duke campaign rallies, the record does not clearly indicate the exact number of violations. Therefore, we assess a single penalty for the violation.

. The Supervisory Committee's letter incorrectly refers to subsection 1491.7(B)(5) as requiring that the names and addresses of fundraising ticket purchasers be reported; the correct statutory reference is to subsection 1491.5(B)(4).

. "Many common law decisions prohibited an opinion to be expressed upon an ultimate issue. Long ago, however, federal courts came to the realization that since the trier of fact is not required to accept the opinion of the witness, opinion evidence on the ultimate issue does not invade the juiy's province. The modern trend is clearly in accord; Wigmore dismissed the common law ultimate issue rule as a mere bit of empty rhetoric.” Graham, Handbook of Federal Evidence, § 704.1 (2nd ed. 1986).